LKQ Corporation v. GM Global Technology Mr. Lennon, please proceed. Thank you, Your Honor, and may it please the Court. The text of Section 103 requires that the obviousness analysis in design or utility patents be done by reference to a person of ordinary skill in the art. Rosen and Durling adopt a strict rule that forbids courts and the Board from even looking beyond a single reference unless that reference was itself basically the same as the patented invention. Mr. Lennon, if we were to conclude that the Rosen-Durling test should be overturned for reasons that you say, do you agree there should nonetheless be an analogous arts requirement to assessing what is the scope and content of the prior art as exists in the utility patent context? Absolutely, Your Honor, and we think analogous arts in the utility patent context is the right analogy. The designer might look within their same field. They might also, in appropriate circumstances, look beyond the field to address the problem being solved. Yeah, but that's a functional language. That's functional language. So I don't, I'm struggling, I don't know if you're familiar with it, but I can only find one piece of art that talks about what the standards for analogous arts is in the design patent context, the K-12 half. So if you don't know it, that's okay. But it doesn't, that's not the test. It doesn't talk in the functional language. That is not the test currently, Your Honor, but I think the reason that there aren't cases that address that issue is that the Rosen-Durling rule has been so narrowing that we've never actually gotten it. I agree. There's no point. If it has to be basically the same, it's in the analogous arts. I get it. So one of the problems I have is that Mary Abrief, despite the many briefs we got, educated this court on what the replacement standard for analogous arts should be. You've agreed there should be one, but nobody told us what that standard would be. And you see one of the problems I have is I have this natural disinclination to employ what feels like the functional language of the analogous arts test for utility patents and drag it over to the design context. Understood, Your Honor. And I don't think that it has to be a functional test or should be a functional test, but I do think it is right that, as the evidence from both sides in this case indicates, designers are setting out to solve problems, and sometimes they will set out to solve those problems by looking elsewhere. So I can give you an analogy not from this Court's precedent, but from cases prior to the creation of the Federal Circuit, in Sidewinder Marine v. Starbuck, the Tenth Circuit, invalidated on obviousness grounds a patent on a windshield for a boat. And the relevant art, the Court said, was windshields for cars, because if you were designing a windshield, you would naturally think to look to other places there might be windshields. So, Your Honor, I think a designer might be solving any of a number of problems. They might be trying to sell products, for instance. They might be trying to make a product look in a particular way. So the testimony in this case, including testimony from GM's expert, Dr. Peters, says designers are absolutely problem solvers. He says, I believe that good automotive design is a three-dimensional product solution to a problem or challenge that is beautifully executed. Counsel, I'm just curious. I mean, just because you're saying, I think one of the hearts of your argument is that it should be a factual case-by-case determination, right? That seems to be something you're emphasizing. But you're suggesting right now that we're supposed to think that in every case the designer is trying to solve a problem for something that is an ornamental design on an article of manufacture. I don't intend to suggest that, Your Honor. And if I gave that impression, I apologize. I think the answer is exactly right, as you stated it. Design differs, circumstances differ, and the right question is a factual question. I think it is often the case, as designers themselves will tell you, that designers are trying to solve problems. They might be trying to make the car look sporty. What do you think the purpose of the analogous art test is? I think the purpose is to make sure that we don't just sort of reach to anything in the world as a potential basis for prior art. Are we trying to define what the ordinary designer would look to in the scope of where they might get incentive or inspiration? Yes, Your Honor. And I think, as with utility patents, that can be the field they work in, but it can also be the problem they are trying to solve. So if I'm trying to build a windshield for a speedboat, I might look to other people who have built windshields. So I think the... To some extent, the same problem exists with respect to the TSM test and the reasonable expectation of success. It's a bit of an awkward fit to just translate the test for utility patents to design patents, and nobody much addresses that either. It's just a bit of a problem. I agree with that, Your Honor, and I think reasonable expectation of success in particular may be one of those concepts that doesn't translate particularly well. And to be clear, our position is not you must apply KSR in all its forms just as you would for a utility patent, what I think this Court must apply is the principle of KSR, which is that we don't simply look at what's in the document. We ask whether a person of skill in the art, or here a designer of skill in the art, would have an articulable reason to modify a reference, to look to a particular reference, and that basic approach, I think, is perfectly consistent across utility and design patents. How it is applied is going to differ, I think, in particular cases, based on the nature of design. Mr. Lumley, is it important that we decide whether KSR overruled or outrated Rosen and Durling, and if that is important, why is it important? I don't think it's important, Your Honor. I think the important thing is that Rosen and Durling are inconsistent with KSR and should not survive that test. Mr. Lumley, the PTO points out that the game for them, a lot of the game is in the examination process, and they take issue with your willingness or advocacy for abrogating the threshold test by saying that, well, yeah, in litigation you get the benefit of design experts, but the examiners don't have that. So what do you say to that? First off, Your Honor, I think we find ourselves in almost entire agreement with the PTO. I don't think the PTO would sort of keep Rosen at either step of Rosen. I do think they are concerned, understandably, about how examiners are going to apply this test. I think the answer to that is the same way they do in utility patents, right, which is we have to consider in appropriate circumstances what a person of skill in the art would do. It's true there won't be expert testimony in the PTO before the examiner, but it is quite common in utility patents for applicants to submit expert declarations on things like the skill of the art, and the rule in the PTO is that they take those declarations as given for purposes of prosecution. That's worked pretty well. And I will note that the PTO, the same concerns were expressed after KSR. How will we do this? How will examiners be able to do this? The PTO, actually, in its guidance after KSR, in the MPEP, said this is no problem. Supreme Court's flexible approach to the obviousness inquiry, it said, is reflected in numerous pre-KSR decisions. That section provides many lines of reasoning to support a determination of obviousness. Section provides many lines of reasoning to support a determination of obviousness. Thus, the type of reasoning sanctioned by the opinion in KSR has long been part of the patent examination process. And, indeed, it turned out that, yes, we had to adjust things, and the rules were not quite the same, but the examination process and the litigation process, I think, have worked quite well in the wake of KSR. And so I'm sensitive to the PTO's concern, but I don't think the solution is a rigid rule, and certainly not a rigid rule that is inconsistent with KSR. In view of KSR, exactly what's the problem, in your view, with the Rosen-Durden test? Is it that it's a test, or is it the manner in which the test is applied? Well, I think the test itself is a problem. It doesn't mean there can't be a test, but this test is inconsistent with KSR. Why would that be a problem? Well, I think the problem is twofold, Your Honor. One is... There's plenty of tests. We have Alice Step 1, Step 2. There's plenty of tests in our law. Why is this one a problem? If I misspoke, I apologize. I do not think the problem is having a test. I think the problem is that the test here... There are two problems. One is that the test here does not allow us to look to the very thing that the statute and KSR say we are to look to, which is the views and knowledge of the designer of ordinary skill in the art. If there is not a reference that is basically the same, we're done, and we can't look outside. Second, the second part of Rosen-Durling, the so-related test, says even if you satisfy that extraordinarily high threshold, you still can't look to anything that a designer might actually think. You can't look to market forces. All you can ask is whether a second piece of prior art is so related to the first, as demonstrated in the piece of prior art itself, that it would suggest combination. And that second part of the test is, I think, even more problematic under KSR, because it's the very teaching suggestion and motivation requirement that KSR rejected. You can't combine these references unless the references themselves point you in that direction. Mr. Linley, do you think the simple substitution rationale from KSR applies in the design patent context for 103? Your Honor, I think the answer is it might in certain factual circumstances, depending... The concern I have is that would start to look like as long as you can find these elements, design elements anywhere in the prior art, then it would just be a simple substitution to replace them with something in your base design and then create the claim design. And then all of a sudden, you don't have to say any more, you don't have to do any more, you don't have to give any further reasoning. And we don't have the same kind of function-based interchangeability between the two given elements that we have in the utility patent. I think that's all correct, Your Honor, and I think it's a reason why you should not simply allow it to happen. The right question is, is there some articulable reason to think designers would have combined these two? But I think sometimes there will be. And Whitman Saddle, to me, is a great example of that. I've taken it that one of the roles that the simple substitution piece of KSR has played is as itself furnishing the reason, which I think to be, at least in my interest and Judge Whitman's question, and that's the problem. But I don't think that's true, Your Honor, except where driven by functional consideration. So I don't think KSR sort of intends or has been interpreted to suggest that you can always just mix and match anything from any piece of prior art. Well, again, I think, Your Honor, it's going to depend on the circumstances, and I think Whitman Saddle is a good example of where it might be appropriate, because the court there made findings that saddle designers were, in fact, regularly in the business of mixing and matching parts of saddles because that's what customers wanted. So they were solving a problem. What do the customers actually want in their saddle? And the court specifically found that, quote, it was customary for saddlers to vary the shape and appearance of saddle trees in numerous ways. Nothing more was done in this instance than to put the two halves of the saddles together in the exercise of the ordinary skill of workmen of the trade and in the way and manner ordinarily done. Now, I think that's true of saddles. Whether it's true of lace designs, I don't know. Mr. Lumley, I wanted to ask you, you said something about solving the problem because customers wanted saddles of different designs, different fronts and backs. So is that a market problem? Is it a customer problem? When you think about analogous arts in the context of utility patents, when we're talking about a problem, is it usually a technical problem? So, yes, Your Honor, although I think KSR makes clear that you don't stop there. And KSR says, in particular, that motivations can come not just from the prior art itself. Counselor, you're not answering our question. She focused on analogous arts, not motivations combined. Those are two different things. You were talking about what art you would look to. It sounded to me. I was thinking about analogous arts. So you referred to problem again. You seem to like the problem test for analogous arts. I was wondering, could you focus on that a little more specifically because it sounded like you were talking about design problems or market problems, customer problems as opposed to a technical problem. Well, I think that's right. And, again, I do think that KSR does suggest that the sources to which you would look are not limited to the prior art itself. KSR says, quote, design incentives and other market forces can prompt variations either in the same field or a different one. And then it goes on to give examples. If a technique's been used to improve one device, maybe it could improve another. The court can take account, the court says, of the inferences and creative steps that a person of ordinary skill would employ. So I think the answer is, while that is both a motivation to combine within the art, I think it is also the answer to sort of what might be a relevant piece of art to solve the problem. Did your view that KSR changed the analogous arts test? No, Your Honor, because I think the analogous arts test was already sufficiently capacious before KSR to reach not just things in the same field but things from outside the field that were designed to solve a particular problem. I know, but I'm still struggling. I haven't been able to wrap my head around the concept of how a design patent would be solving a particular problem. I understood the analogous arts to limit the universe of what an ordinarily skilled person in that art would turn to. And so I understand not wanting to limit it to the same field of endeavor, but like so many aspects of obviousness don't have natural analogs. Don't sort of naturally flow from utilities to design patents. I'm similarly struggling with the analogous arts and what the test should be. We don't want to replace one potentially bad test with a different potentially bad test. Understood, Your Honor. But I do think the test is articulated in the utility patents actually fits this not terribly poorly because what it says is dependent on what the person of ordinary skill in the art would do. And so if this is a circumstance in which I am interested in achieving a particular result and I know there are things outside of my field that point to that result, I suggested the windshield example from the Tenth Circuit, but you might imagine that if my goal was to make a car look sleek and sporty. Let me ask you a different question. So the windshield example could be encapsulated by just extending the field of endeavor, right? Maybe the answer is same field of endeavor, but the field of endeavor is not limited to the product itself and its particular use. Maybe the field of endeavor could be glass or glass making. I don't know. I'm trying to wrap my head around what the right articulation is but certainly the field of endeavor is a portion of the analogous arts that I've seen contract and expand. I think that's fair, Your Honor. But I do think there are circumstances in which because I am trying to achieve a particular goal, I might look outside that field of endeavor. And all I'm suggesting is that this court should, as it does in the utility patent context, leave open the possibility that analogous art is not limited to however narrowly or broadly a particular court defines those. Let me throw out something crazy. Ready? You said leave open the possibility. One of the problems I'm struggling with, as you can see, is you seem to agree analogous art would still apply, but I'm struggling with the fact that our prior design patent law cases, in which, as you have acknowledged, didn't really tackle the analogous arts, but it was a modeling test. Maybe I can tell something more. So anyway, and we don't have briefings on this point. I'm certainly not asking for supplemental briefings. But would it be crazy if the court were to say analogous art slash left to another day to figure out the contours of it? I think that would be fine. That is, I don't think it's actually presented in this case by the facts of this case. It's authentic. Yes, exactly. Or real well, whatever. Right. I think that would be fine. I think the one thing that is important is that the court not simply get rid of part one of the Rosen test and leave us with these so-related tests that essentially cabins the analogous arts doctrine to nothing. The second part of Rosen and Durling also, I think, has to fail under KSR. Do you agree that Glavo's case is the first case, I think, to introduce the so-related case and did so in order to be able to try to figure out what analogous art is? Well, I think, Your Honor, I mean... There's language right in that case that says, you know, the utility patent analogous arts test doesn't apply. And then they say we're going to use the so-related test. And unfortunately, the result of that, I think, has been to essentially eliminate any analogous art, right, to say only things that themselves within the design itself point to the other are going to be included. And I just think that's too narrow under KSR. That's flatly inconsistent with what KSR itself said. Well, if Glavo's was meant to create an analogous art test and it's not workable, then one would think Glavo's would be something that should be reconsidered as well, the so-related test. Oh, absolutely. I agree with that. I'd like to better understand your position on the starting point. You said, I think, you largely are in agreement with the PTO position, though they would limit the starting point to a suitable reference. I don't understand you to be accepting that. And just more generally, what would be wrong with a return to something like Jennings, something in existence, perhaps a complete design? So, Your Honor, I think the answer is that that will often be the right starting point because it's often where designers would start. But it's not always where designers would start. And I think in both KSR and in Whitman Saddle, the court sort of not only left open, but applied the possibility that you might be motivated to take two different things, neither of which really qualifies as a primary reference. I agree with that. Would you have to allow the starting point to be just a single ornamental feature, or does it have to be at least something like a complete design? I think it would be an extraordinary circumstance in which it was a single ornamental feature, and I'd want to know of a circumstance of why that would be true. I think you'd want some pretty strong evidence that that was true. I do think it is important that this court leave open the possibility of something like Whitman Saddle, where the practice in the industry is take the front half of a saddle from one and the back half of a saddle from another. Well, is that done with the PTO test? Because I understand the PTO test, which you seem to have embraced, is that even if you don't match the first starting point, you get to keep going. So even if Whitman Saddle doesn't fit neatly into you've got one singular starting point, if you can keep going, it will allow for that to work. I think that's right, Your Honor, as long as this court is clear that this is not Rosen under another name where we've kind of put a little more flexibility into basically the same test, that there will be circumstances in which we are taking different parts. Just as in KSR, the court said you could start with the pedal assembly and add the electronic sensor, or you could start with the electronic sensor and add the pedal assembly, and either of those would be a potentially legitimate combination for an inventor. Do you agree that Whitman Saddle had a primary reference? They refer to the Granger saddle with a substitution of the Jennifer Cantle to the low, broad Cantle of the Granger. I don't, I mean, I think... I mean, from a KSR standpoint, why isn't that a primary reference? I think it goes back to Judge Post's question, Your Honor. That is, if primary reference is reduced to mean simply a place we start, but not something that has to have all or most of the pieces, then we're fine with it. I think the key is that where we want to start is where designers would start, and that will usually be with a single primary reference, but I don't think it should exclude circumstances like Whitman Saddle where you might be motivated to combine these two things, each of which are pretty substantially different than the other. I understand that you want to dislodge the Rosen-Durling test, but would you object to an opinion that said something like, a Rosen reference that shows basically the same design as the claim design is a useful, compelling tool to the 103 inquiry. Maybe it basically puts you on the four or five yard line, but it's not always required. But we would typically expect that a base reference, a primary reference, as a starting point would be the same particle of manufacture and have a number of visual similarities to the claim design. So I think a lot will depend on how exactly it's phrased. And then to keep going, because to start with a very visually dissimilar base reference seems very unlikely that you would ever successfully make a 103 case. That's a run-on sentence, but you understand the points that we're trying to make here where we want flexibility in the test, but there should be some expectations in how a design patent examiner should be thinking or how a design patent challenger should be thinking in terms of how to organize their case. I do understand that, Your Honor, and I guess what I would say is, I think the idea that Rosen, while no longer required, is optional. It is a way and maybe an easy way to show obviousness we are fine with. And then I think beyond that, the question is, right, whether the articulation ends up being Rosen under another name, right, whether the PTO or the district courts end up kind of falling back on something like basically the same. We'd want to avoid that. I know we've been living under a Rosen-Derling world for quite a few decades, but just going all the way back to Whitten and Saddle, I'm not aware of an example of a case anywhere where the primary reference was far-field from the claim design or was very visually dissimilar from the claim design. And so if we really were to invite that kind of inquiry, we would really be in wide-open territory. I understood, Your Honor, and I guess what I would say is, I think maybe a way that I would be more comfortable with the articulation is not, you can never do this under any circumstances, but this is the norm and it would require strong evidence to believe that somebody would start with a completely different field. And that, I think, could be consistent with this idea of KSR's articulable reason to make this modification. And I think, as you suggested, in the vast majority of cases that's not true, and maybe that will turn out to be true in all cases, that we're going to start there. I am nervous about the idea that something that gets articulated as a sort of rule ends up getting ossified. I'm nervous about the idea you're losing all your bubbles. I am too, Your Honor. I'm happy to answer other questions. I guess the problem is that you could have a situation which is a new article of manufacture, which doesn't find a template in O or R, and somebody's starting from scratch, and you want to preserve the possibility of an obvious misanalysis under those circumstances. I agree with that, Your Honor. And so one of the things that's notable in the Analogous Art Test and Utility Patents is that it says the art of the field or the field with which it is most closely connected, which I think is designed to accommodate precisely that concern. I have some concern that the case that we have before us is an industry-specific case. Looking at all the amicus briefs that we've got, and we've got quite a few of them, almost all of them, if not all, are within the auto parts and auto industry. Where's everybody else? Where's the outcry? Where are the other designers? Let me finish. So aren't we entering a slippery slope here in trying to fashion a new test under your arguments when we don't fully understand the implications of what we're doing? Your Honor, I think that's precisely why the test you articulate should be a fact-specific, industry-specific test. It may well be that designers in different industries Do you mean we have a different test for different industries? No, Your Honor. I think you have an approach, the KSR approach, that is sufficiently general that it asks the question, what would a designer of ordinary skill in the art do? And that allows for the possibility that designers in automotive are going to do something very different than designers in a different field. And I think one example of how that happens, right, there are a number of parts of the design in this patent that are dictated by the fact that car fenders need to attach to car doors, right? People want them to actually sort of touch each other, right? And so if the door is cut in a certain way, the fender has to be cut. If the Rosen-Durden test is a problem, shouldn't we be hearing from other industries or other industry sectors? Well, I do think it is a particular problem in the automotive industry not for reasons of doctrine, but for reasons of policy. The automotive industry is doing its best to eliminate the right to repair. There's not too many cases in this dealing with this particular issue, a design patent case. Shouldn't we just let this percolate, you know, within our own circuit and let the bar and the industries come and help us, and let Joseph guide us through the cases that are actually presented? Your Honor, I think it's not going to percolate. We've had this doctrine for a number of years, and because we've had this doctrine, the cases that come to this court are a very skewed subset, right? Nobody brings an appeal in circumstances where they don't think they could make it. If there's no percolation, then there's no problem. I disagree with that, Your Honor, because the board and the district courts and the PTO are applying Rosen and Durling, and they are applying it in a very rigid way. It's why we see that only 2% of PTO design patents have even an initial rejection for obviousness compared to the much larger number in utility patents. It's why the board in cases like Campbell repeatedly said, even though the only difference is did you depict the can in the can dispenser, Rosen requires us to hold otherwise. I think there have been a number of cases that present this issue. I do think it is a particular problem in the auto industry because the companies like GM are getting hundreds of dubious design patents in an effort to shut down the right to repair your car, but the fact that it has come up in this industry and it's a big deal in this industry doesn't mean it's not a problem elsewhere. I wanted to ask you one quick question along the lines of what Judge Chang had mentioned. When I read the Rosen opinion, I saw that there were some statements in there that would remain something that I would think a patent owner could argue was a factual matter for why it would be that their patent is not obvious. For example, there was some complaint that modifications of Rosen necessary to achieve repellent table design would destroy the fundamental characteristics of the Rosen design.  You've got to modify this primary prior art reference so much to obtain the claim design, but that totally undermines the prior art as well as shows non-obviousness, if you will. Would you agree with that? Absolutely, Your Honor. I think one way to accommodate that is in the doctrines we have in the object of evidence. Teaching away, for instance, that might be an example of teaching away. If you have to break the form of one design in order to match it with the other, that's not something that the design itself would suggest. There may be unexpected results as well. I think there will be circumstances and absolutely the freedom to argue. A designer wouldn't do this because this is inconsistent with the way design works in this industry. Thank you, Mr. Lyons. Thank you, Your Honor. Who is next on the floor? Good morning, and may I please report? We urge the Court to resist LKQ's over-reading of KSR and also to resist GM's under-reading of it. We provide a very middle-of-the-ground approach. What exactly is your proposed test? Our approach is exactly what KSR did. KSR didn't say that overrule TSM. KSR said TSM provides a very helpful insight. It is the fastest way to arrive at an obviousness case. It is the exemplary obviousness case. What is your approach? Our approach is to basically remove all threshold requirements. No cut-offs, no thresholds. What about analogous art? Analogous art exists the way it currently exists. That is a threshold requirement. The only thing that we would change in that requirement is I think that so long as it is merely the same, the language that this Court adopted in MRC, we think that is sufficient. That is the analogous art test for design patterns. The only thing that we would change in that is we would say that we should be able to... I'm sorry, merely the same? What did you just say? What is the test? The test is that mere similarity between references is sufficient to provide... What does that mean? So long as the references are... It's sort of like a basic understanding. If the references are similar... That is a threshold test, though, right? You just said no threshold test, then you agreed with analogous art, and now you're saying mere similarity of the references, also a threshold test, and potentially all different threshold tests. No, we're saying that the existing test is fine. We are saying that it should be understood. The Rosen-Durling test is fine, but we do recommend some changes to it. We suggest that you get rid of any sort of threshold requirements when it comes to the second part of the Rosen-Durling test. We think mere similarities, as this Court found in MRC, is sufficient. You wanted to keep Rosen-Durling, but there should be no threshold requirement. Rosen absolutely has a threshold requirement. You can't be considered as the primary reference unless you're basically the same. So what is it? Do you want to keep that? No, we would change that. What we would do is we would soften basically the same to have a more expansive approach to it. We would say that basically... What approach? Can you just give us some words to describe your approach? Our approach is that it should have an overall similar visual impression. That is our approach. That sounds very much like the existing test. Not really. The existing test is almost very much like the anticipation test. The existing test does... What about the closest prior off? Isn't that a sound test for a sounding point in respect to a loudness? Yes. We think you should maintain that aspect of Rosen. We think that aspect of Rosen is really important. Exactly the same should be closest prior off. We think basically the same should mean that it has the overall visual impression of the claimed design. What that means... But that's exactly what your test is not being... You don't have to meet the threshold. If it's a nice threshold, then you try to start there, but if you don't meet it, you still go on. That's exactly right. Okay. That's exactly right. And that's unlike Rosen. When you stop, you don't meet the threshold. That's right. I think, you know, the basic insight from KSR that needs to be applied to that aspect of the Rosen test is just to recognize that you might have rare circumstances where you will be combining references that don't meet this, you know, primary reference requirement, and you should be able to kind of leave the door open to common sense and let that in. And what... Your primary reference, the description of it is different than Rosen, right? It is. We relax it a bit. We soften it a bit. And we say, you know, just something that has broadly the same overall impression is good enough. What we mean by that is if you look at this court's case law, you know, if you have to modify every individual feature, as in Jennings, then it's likely not the same or, you know, likely not to meet our broader test. If you need to make major... How is your test consistent with Whitman-Saddle? I don't understand that. Because if you think about Whitman-Saddle, you know, under the current Rosen and Darling test, perhaps there is some tension. But if you understand Rosen in light of Jennings, where Rosen was really just concerned about this five-way combination, then Whitman-Saddle is not really a conflict. Because in Whitman... Where in Whitman-Saddle is there a reference to an overall similar impression of whatever you're testing? We don't think there is. And that's why we think you should continue. That's why we think that if you can't find a reference that is basically the same or has that same, you know, overall visual impression, you still continue because you don't want to close the door to common sense. You don't want to close the door to the type of evidence that was available. When you continue, what test do you apply in continuation? You look to see whether or not an ordinary designer would have incorporated those elements that are missing or, you know, put them together. And in Whitman-Saddle, that evidence was so substantive, you just can't close your eyes to that, that evidence shows that there are hundreds of saddles that mix and match front and back end designs. And if that's right, then we have to take that into consideration. We can't, you know, not see that. We have to acknowledge that. But we still think it would be a very rare situation where you would have to go beyond a primary reference. Why is it rare? Because in the design world, you know, if you have something that is not visually similar to something already in existence, you have to compare two things. You have to have a reference point. And if it's not the same, then most likely it's not obvious. You know, it's a very strong, almost like a presumption that, you know, that the clean design isn't obvious. But we continue anyways just to make sure that there isn't this other evidence out there in the record that suggests otherwise, that other evidence could be interesting. Why can't this just be like utility patterns? I mean, you acknowledge that if you fail on the first test, you go on to the second. You apply the rules of obviousness. Why do you, why? I appreciate that maybe out of respect for this court, you're trying to cling to as much of Rose and Darling as you can. But leaving that aside, why? You know, I don't think it's necessary to view this as a two-step process. It is a holistic approach. If an examiner has before it a claim to design, they look to find the art in that area. And they look for, you know, all the pertinent art in that area. And then from there, they look to the one that is the closest. But they might find others that also satisfy this primary requirement. But they choose one. They compare it to the claim to mention. They look to see whether or not a designer would modify it based on their common understanding, based on creativity, based on, you know, you know. What about the secondary reference? I'm sorry. And also secondary references at the same time. They would also look at the secondary references and see if those secondary references include some of the design characteristics that would be included in order to arrive at the claim to mention. So this can all be done at once. It doesn't have to be a two-step process. What all we're saying is, you know, get rid of the thresholds. Get rid of any kind of bars. And relax what it means to be basically the same. And what we think, you know, in terms of what art you look at in terms of secondary references can be consistent with what this part has already said in MRC. So does any reference in this particular case satisfy your similar visual effect standard? We have not taken a position on that in this case. What we think happens to be. It's hard for us to know what you think similar visual effect means. Might be different than something that I might think what similar visual effect means. I mean, we need some kind of measuring stick here to figure out what these words mean compared to basically the same. That's right. So I think, you know, if you look at the case law, I think the case law tells you that at step one. They do look sort of the same, right? The end and the claim design. The board found that there were seven differences. I think, you know, the problem really here was that the board cut off the analysis after that first step. And that's what we think is problematic in light of KSR. So in light of that, we would ask this court to remand it back so that we can evaluate it under, you know, hopefully the test that we're proposing. Before the end of your brief, you talk about the examinations. And you highlight your 40,000 applications every year. And you criticize LK2 tests because, you know, we don't fly. We don't hire designers, the experts, whatever. So how does your approach differ from LK2's approach? We don't think access to experts is a substitute for having a starting point. We think a starting point is very critical to understanding design claims. And so we would maintain that. And we also don't think that this litigation-generated evidence is all that helpful in the examination context to begin with. We think that our examiners are as capable as they are on the utility side, and as they already do on the design side, to look at the prior art and to figure out what the, you know, who the person at scale in the art is, and to proceed from there. We don't need an expert to tell us that. The difference is you need a starting point. Even if you aren't satisfied by the starting point, you still continue to do an honest analysis. That's exactly right. We have this. Ms. Rasheeda, I have another concern about what the board did here related to claim construction. It seems like they view that if LKQs fail to articulate an accurate description of the visual appearance, that that alone, standing alone, defeated their obvious misintention. Is that a rigidity? And would the government have to do something about that? You know, if you look at that language at ATPS 1551, I think if you look at that language in a vacuum, that standing alone does seem a bit problematic. But I think when you look at it in context, all the board was saying there was that they didn't really agree with the claim construction that LKQ had provided, and that if they had, you know, applying that claim construction to the record before it, they found against LKQ, both on anticipation and obviousness. I don't think that they were suggesting that they fail to provide, you know, the right claim construction. The evidence already understands that they can't stop the obvious analysis by simply finding that a purported or a proposed claim construction is wrong. I think that's right. I don't think that's a rigid rule. I think this is a, you know, an odd situation in this particular case. What is your view of the scope and context of prior art? What the analogous art should allow the examiner or anyone else to do with this work? How would we explain the analogous art context in these archives? We would look, I think this court should look at what Gladys said. Go back to the origins of Gerling, which said that you look to similar references. You look to the nature of the art. Similar designs, similar products, same field of endeavor, or reasonably pertinent to the problem. Is the same field of endeavor here, similar designs? Because you could have the same design on the sofa that's on the china that's on, you know, or is it the product it's applied to? I think it could be both. I think it depends on the context. I think it could be both. And if you look at what the court did in Gladys, right, in Gladys they said yes. It could be both. What Mr. Lonely and I understood him to suggest is that you should look at sort of in a I know syncretic sounds like a bad word and I don't mean it that way, but like as in a case-by-case basis based on the particular field and what the particular designer in that field would have considered. Do you agree with that? I think that is really grafting too much of what happens in the utility context into the design context. I don't think this court needs to go there. I think the Borden case provides sufficient guidance. Borden said you don't just look to, you know, related design concepts and try to import those from secondary references into the primary reference. Why not? If that's customary to the particular design. Say you have, you know, furniture designers and it's established, and this is a hypothetical, I have no idea if it's true or not, but you have furniture designers and they routinely look to what's from architecture to furniture. Wouldn't that be something you could look to even though a design for a building is certainly not remotely in the same endeavor as a furniture designer? If, as a matter of fact, the skilled designers routinely look there, why wouldn't that be okay? I agree with you 100%. I'm not saying anything to the contrary. What I am saying is both in analyzing, you know, whether or not a reference satisfies a broader understanding of basically the same and whether or not something is so related, you always have to take into consideration. What I have is that you started a few minutes ago by saying we don't hire designers. We don't hire experts. So how in the world are the examiners going to evaluate the circumstances that you proposed, which, by the way, I agree with completely what you proposed, and I'm just wondering how you're going to implement that. Because if we're saying, if the position is... I don't know where your mic is. I agree with this. Furniture and architecture. Oh, furniture and architecture, right? But if you don't have any furniture designers on staff at the PTO who are examining applications, how are you going to know that you can look to prior art in the architecture field because a designer in that space would otherwise do that? So I just wanted to quickly go back to Judge Feetley's question. We think that at both points you should take into consideration what an ordinary designer would take into consideration. Take into consideration common sense, design trends, industry custom. All of that comes into play. We're not saying that you don't consider this outside of that. That is always part of the analysis. And in terms of, just to get back, Judge Moore, to your question, the examiner can look at the art and figure it out. We might be citing some more art under this more expansive approach, but if you have ten references that show a design, you know, a trend in a particular industry or show that this is a custom or if you have a catalog like the catalog that existed in Wittman's model, that's enough. The prior art is a picture of a design applied to a particular group. How is your examiner going to figure out that people, designers in this industry, would look at surfaces or architecture or whatever? It's because the examiner just doesn't look at one document at a time. The examiner does a very broad search. And in the design field, there is no shortage of prior art. There's actually, the art is actually overwhelming. The scope and function of the prior art in the analogous arts doctrine is disregarded in hindsight. Your examiners aren't supposed to go do a search of every design ever created. They're supposed to focus their search on what designers would have done. And they do. They use the nature of the art and the claim to design to create that search. I'm concerned too. How would the examiner know the answer to the question whether they routinely look to what seems to be a completely disparate field or not? I think there's a way to do that within... I mean, you could have a hypothetical where furniture designers never looked at architecture. It's just not done. Or it's done routinely. But how does the examiner... I mean, in litigation, we can get to this through experts. But how does the examiner, the PTO, know whether to look to that or not as a prior art reference? So, for example, if the claimed invention was to a woven basket used as a lampshade. Like, if that is the... You know, those are two different arts. You know, lamps and woven baskets. But if the claimed invention is to that, if the claimed design is to that, an examiner can get on to... Part of the search is Pinterest. Part of the search is, you know, other areas, catalogs that exist. If the examiner sees that there are actually a whole lot of lampshades out there that use baskets or lamps out there that use baskets as lampshades, that's evidence that this is, you know, common practice. What besides prior design patents do examiners search? They search patents. They search databases. They search... Databases of what? There's a design finder database out there. They search the JPO database. They search Amazon. They search Pinterest. They search eBay. They search social media sites. It's extensive. A design finder database. How does the examiner know that that's something that an ordinary field designer in a particular field would have referenced or hoped to? It would be based on what the claimed invention is, what the nature of that invention is. So, for example, if the article of manufacture is a chair, what would they search? I think that if it's a chair, it would include furniture more broadly because that makes a lot of sense. It's not just limited to chairs or a specific type of chair. I think they would look at furniture overall. What if it was a lampshade? I think if it was a lampshade, they would look, you know, into... Yeah, if the claimed design is a lampshade, then they would look at other lampshades. The claimed design is not a lampshade. The claimed design is an ornamental design that might be applied to a lampshade. Sure. Well, no, it could be the... It could be an ornamental design applied to the cover of the lampshade or it could be the form of the actual lampshade. I mean, it could be both. We ask the court to remand. We ask the court to strike out a new test in line with what we are suggesting and then to remand to have the board re-evaluate based on that test. Can I ask you one last question, which is that when I heard you earlier describing what your test was, I think you may have suggested that the PCO thinks it's very, very to go beyond the primary reference. Is that true? Is that what you said? Yes, that is true. We think, in most cases, the primary reference will resolve the case, but there might be circumstances like Whitman-Saddle where we would need to combine with other references or the primary isn't really a primary where we have to move on and look for other references. Because the initial search will give you a wide view of what the scope of the art is, and so when you have that before you and you choose one that you think is the closest, you still have that other art that you have evaluated. Why is it weird to go on after you don't find such a primary? Because we do think that there is something very special about designs that, you know, if it doesn't give you the same overall visual impression, that most likely it isn't obvious. That is a pretty strong indication that it isn't obvious, but we continue in order to take into consideration common sense in order so that we don't shut the door. So then you do go on. Yes. So if you don't find your visually similar base reference, you do go on and complete the full 103? Yes, we do a holistic. What did you mean when you said we don't go on? Oh, I guess what I meant by that is, sorry, I might have misspoken there. What I meant by that is usually if you find a primary reference, that is a primary reference that is very similar to the claim to design and only minor modifications need to be made that are within the skill of an ordinary designer that is sufficient to render the design obvious. That's what I meant by that. In a situation where you don't have a reference that comes at all close to the claimed invention, then that is a very good indication that it is not obvious, but you still continue and you look to see if there is something else in the scope of the art that would get you to the claimed invention by combining it. Why is it a good indication that it is not obvious that there is no primary reference? Because there are so many modifications, right? I mean the way you would define whether or not something has the same overall visual, gives you the same overall visual impression is to see how different it is from the prior art. And if it is very different or if it requires a whole lot of modifications or if there are substantial changes, then I think that is an indication that... Well, I mean in this case, the CEO found there were seven modifications, but I look at those things and they certainly give me the same overall visual impression. Now I'm not a person of skill in the art, I'm not a fact finder, but what is going to be the test for that then, under your circumstances? Under your proposed test, how is that going to work, this overall similar impression? Is it a wrong number, something with minor differences, is it sort of an overall view? I think the best thing to do is to look at the case law that this court has developed. This court has said that if there are major modifications that need to be made in order to arrive at the claimed design from the prior art, then it's likely not a primary. I'm just trying to figure out whether I'm going to have to see Mark Lumley a year and a half from now, whether or not this is visually similar or not. We don't want you to replace one RGGI test with another, and I think there's no point in doing that. We are trying to give you a holistic approach. This may be a little bit out of left field, but has the PTO taken into consideration what artificial intelligence portends for a new test in this area? We are studying that very carefully across the board at the agency, the implications of AI for our search, for our examination. I don't have an answer for you specifically as to what it means for design examination, but it is an important issue. Do you know what would impact the two-step process here, just turn it into one step? I think part of that is I'm not sure. I think we don't think it has to be a two-step, one-step thing. We think we can do it all at once. But we do think it's important to start with a starting point. I suppose if you have a claim to design and you threw it into an AI machine and it can quickly kind of figure out how close or how far away it is from another reference, give you an indication as to whether it's... And then finally, does it have to be an ornamental design for an article of manufacture? No, it does not have to be. It could be a lot of different things, right? It could be most likely it is going to be another article. You can get a design patent, but it has to be an ornamental design for an article of manufacture. Yes, that is what the statute says. But to use as a reference, it doesn't have to be on an article of manufacture or that part of the statute has no play? Most likely it is. We do look at other articles of manufacture. We look at other designs. What about a tattoo? I think that's probably okay if it's a surface design to look at. Is it true that only about 1-2% of all design patent applications get a prior rejection during examination? It's a little higher than that, Your Honor, but it isn't anywhere close to utility. How much higher do you know? It's about 4% from our most recent data. But the fact that there aren't obvious rejections at the same rate that there are in utility is not an indication of a problem. I think they're just very different. And to confuse correlation with causation, I think, is extremely problematic. There's nothing inherently wrong with design patents. Okay, I think we have your argument. We'll proceed. Thank you very much. I'll autograph your name. Thank you, Your Honors, and may it please the Court. The Rosen-Durling Framework is an important and thoughtfully developed application of GRAM tailored to the unique issues in design patent litigation. This Court and its predecessor have refined that framework over the last 40 years, including in the 15th sense Rosen, addressing questions such as what it means to be basically the same, the scope of relevant art and the obvious analysis, and the kinds of evidence to support modifying the primary reference. And it has done so in a way that illustrates the flexibility of this framework in its application. KSR did not overrule Rosen-Durling and does not otherwise prohibit the Court's application of non-staffed work. We can reconsider it. Yes, Your Honor, I would agree with that. My understanding of our standards for the anticipatory reference in design patents is something that is substantially the same to the claim design. And if you could assume for the moment that, at the moment, I don't understand the difference between that standard and our Rosen reference standard for basically the same design, how would you educate me to identify the daylight between substantially the same and basically the same? So I think that there are two or three significant differences there. So the substantial similarity test, of course, is from the context of the ordinary observer. That's sort of the easy difference. Getting into more of the nuance, it has to be such that it would deceive that ordinary observer into believing one thing is the other. So there's an element of deception there that creates a higher standard than basically the same test. And the final thing I would say, Your Honors, is that in anticipation and infringement, there is a concern over application for the particular article. It has to be the same article. And we see that coming through in the most recent Columbia Sirius case. Whereas that's not necessarily the requirement in obviousness. For the Rosen reference? The Rosen reference doesn't have to be the same article of manufacture? There is a universe in which it may not have to be. And I would actually take Your Honors back to the Glavis case, which I think is insightful on a number of points, including this one. And basically what Glavis says, in some language I think is applicable here, is if we're talking about a vase, it's probably got to be a vase. It's a primary reference. If we're talking about a design on that vase, perhaps that could be a design seen in the curtains in the trier art. It depends. And that's some flexibility that is incorporated into that obviousness analysis as compared to anticipation. In pages 38 and 39 of your brief, you say the Supreme Court's analysis in Whitman-Saddle is consistent with how Rosen journaling has been applied. How is that a credible article? I think, Your Honor, the way we see Whitman-Saddle is a few ways. It's the court sitting in equity, of course, 50 years before 103 and about 100 years before Rosen journaling. But what they're doing there is applying a test where we have a primary reference, and frankly I think either one of those could have served as a primary reference, looking to the full scope of the art, which Rosen freely applies, and I can get into that in a minute. Neither could be a Rosen reference, but neither one is substantially the same. I think they absolutely could be, Your Honor. There's a lot of focus in the briefs about the very front of the saddle and the very rear, the pommel and the cancel, and that's been sort of turned into this idea that it's a 50-50 split. But I think if you look at the saddles, that midsection also shares many commonalities with the claim design and, frankly, probably with the rest of the prior art. How could either of the saddle references be a Rosen reference if the YM reference here is not? It's dependent on the art, Your Honor, and this case presented one in which Are you contending that each of those saddles look more like the claimed challenge saddle than the Leanne reference look to your patent? No, Your Honor. I'm not making that contention. I'm making the contention that a fact finder, in the case of the Wittman saddle case, could have properly found that either one of those are our primary reference. The facts in our case revealed that designers of ordinary skill in this particular field are attuned to nuanced differences and that those differences draw an important distinction between the primary reference here, Leanne, and the claimed reference. There was seven differences that the board went to, and they did so in the context of considering the full scope of the prior art. And I think an important If somebody tried to count the differences between the two references, the Wittman saddle and the claimed design, you would easily get to more than seven, starting with the fact that it's a front half back half situation. I don't understand the follow-on on Judge Brooks. I'm not sure how that's a credible argument. Well, it was the fact of that case that led to that conclusion, the robustness of the art there. But I think on Wittman, another point we'd like to make is it doesn't preclude the future use of further development of this test doing exactly what intermediate courts do. There's nothing in Wittman saddle that precludes the further development of a test, of the Rosen-Durling test that we see today, and it's not fundamentally inconsistent with Wittman saddle. I'm a little confused there. Are you suggesting that the Rosen-Durling test is an open test, it's not a closed test? My understanding is if you don't have a Rosen reference, it's open. Your 103 challenge is kaput. But are you suggesting, no, that's not really the case, maybe there's something more the challenger could do above and beyond the Rosen-Durling framework? Yeah, let me be very clear on our argument here. I think we would not agree with the way that the government phrases it, which is, as I understand it, as a matter of ordinary course, even if there's not a Rosen reference, you continue. The way we would phrase it, Your Honors, is there may be a case out there in which a patent challenger can show obviousness outside of the context of Rosen-Durling. But to my knowledge, that hasn't been an exception that's been articulated. It wasn't articulated here below. It's not been articulated here today. I guess it depends on how you read Wittman saddle, of course. Perhaps, Your Honor, I guess outside of that, based on our reading of Wittman saddle, we don't believe it's been articulated. So what we would suggest is if the court is inclined to give an additional off-ramp or additional flexibility to this test, that the way to do it would be, in our view, to affirm the principle of Rosen-Durling but not foreclose the possibility that in the future, in a case where it's been fully articulated, the exact circumstances... Frankly, Your Honor, standing here today, we think it's going to be a rare case, if any. And I think we would very well argue against it. But I think Your Honor had raised this prospect of a new product. And that might be one. I think you might argue as a patent owner that lends itself to novelty and non-obviousness, the fact that it's new. But that might be a case in which, under the right facts, a patent challenger could articulate an exception here, that it sits outside of the general rule. We also say in your brief at 39 that the degree of similarity will vary depending on the art. So I don't understand what factors would inform this degree of similarity, which is based on art specifics. How is that a workable standard? So I think that it... I think about this in the way I think the Court in part was thinking about this in Egyptian Goddess. And that is that the similarities or the commonalities and the differences between a primary reference and the patent are going to vary depending on what else is out there in this art. When will we actually articulate it in this particular case? I hear my opponent saying this test does not allow for consideration of the full scope of the prior art. That's absolutely not true. We urge the Board in this case to look at the full scope of the prior art because in our view it illustrated the importance of the differences between the primary reference and the claims patent. And the Board, in fact, then went on to do that in Appendix 13, 35, and 53, finding that the art illustrates the commonalities and differences. So, Your Honor, I think it's the kind of thing that is fact-dependent because you can imagine a situation which, as we articulated here, the relatively crowded art, designers are relatively sophisticated, and so they're drawn to nuance and they're drawn to differences in a way that perhaps in a different art they wouldn't be. And that's how the prior art, the full scope of the prior art, really contributes to this analysis. Counsel, do you think the analogous arts test has any place in a Rosen-Derling type analysis of obviousness? I think, Your Honor, if you can't find a piece of analogous art, you're not likely to find a Rosen-Derling art. In other words, you probably don't even have to think about analogous art if what you need to have is a Rosen test. I think you may need to think about it as a second step more. I think it's maybe a hurdle, but a small one. It's baked into the Derling secondary reference test. It has to be so related to the primary reference that that's already baked in the idea of analogous art. I think generally, yes. And if you trace the history back to the Glavis case, they were talking about the analogous arts and how we look at that vis-à-vis the mechanical arts, how we look at that from more of a design-based motivation rather than mechanical motivation. Why couldn't they just rely on, instead of Glavis, having the so-related test? Why couldn't an analogous art test work in more of a flexible fact-based analysis? I think that Glavis is more flexible and is indeed more flexible than LKQ has given it credit for. Because, frankly, if you look at the way Glavis developed it, it is much closer that that secondary reference needs to be along the lines of the Hub case, Your Honor, where it's got to be something sufficiently- It's just like you're not answering my question, though. My question was, why can't the analogous arts test replace the so-related test in a way that provides a more flexible analysis? Because I think replacing it without more is going to remove a step, which is that there should be a reason that someone would actually take that next step to make the combination. So that's a different question, isn't it? I mean, there's a question of whether the art that's being considered has to be analogous art, because that defines what an ordinary designer would know. And then also, separate from that, there has to be a reason to combine. Right? Yes, Your Honor. I mean, under a KSR analysis. Yeah. So I think if the so-related test- Assuming we've still got that additional requirement- Okay, let's assume that Rosemary Durling- God. Now focus on, what should the analogous arts test be? Because the motivation still exists, right? Graham has three factors in throwing out secondary consideration, because I'm struggling with how they apply in design practice. So we've got three Graham factors. Scope and content of prior art. The way it works in the utility. That's the only one that's there is analogous art. Then we have step two. Compare them to assess their differences, and that's where you would do something like what Rosemary does. Compare them to assess their differences. Step three is then, what would be the motivation, and why would a skilled artisan make this combination? Imagine now I'm going to superimpose that crazy, very unique thinking onto design practice. Assume that's what's going to happen. Tell me what you want out of it. What's analogous art, yeah. I think analogous art is articulated in pop. It's got to be the same article manufacturer or article sufficiently similar that a person of ordinary skill would look at such articles for their design. That's focusing on the article. What if Judge Hughes' typo is absolutely correct, and that ordinarily skilled furniture designers absolutely routinely look at building architecture to sort of incorporate the modern aspects of building architecture into the furniture design. That HUB test has us focusing on the similarity of the article the design applied to, as opposed to what a designer would look for. I think, yeah, that's a fair clarification, Your Honor, and I didn't mean to over-read, and I think read literally HUB does focus on the article. I think from our view it should be something that could eliminate that article's language of sufficient similarity a person of ordinary skill in the design, ordinary skill would look to it. It doesn't necessarily have to be an article. It could be something else motivating a person to look at it. If a designer of ordinary skill in the art would look for design inspiration to a particular type of reference or a field, then you would not oppose, in a world in which there is no Rosemary Durling, you would agree that the analogous art test should be broad enough to capture that, correct? I would agree with that, Your Honor. Can you help me understand this? So sometimes there's talk about the ordinary observer, sometimes there's talk about the ordinary designer. Can you put those phrases in their proper boxes for me? Yes, Your Honor. So the ordinary observer would be the test that we apply primarily to infringement and anticipation, whereas the ordinary designer would be limited to the final three. So at some point in the obviousness analysis, do you fill a role for saying overall, boy, these things look very, very similar to me and I'm not a designer? Not from our perspective, Your Honor. I think that the analysis, whether it's by a court at summer judgment or the fact finder at a jury trial, the analysis needs to remain focused on the perspective of the ordinary designer. Your Honor, what is your view on claims construction? Did the board get it wrong here by suggesting it was a dispositive failing? And more importantly, what would you have us say, if anything, about claims construction? I think the way we understand that first test is if you were to throw an analog to the utility context, I don't think that test means that if you interpret construed semiconductor wrong in the utility context, you lose. I don't think that's what it means. I think what that test means is we're looking at the overall visual impression. And if you don't articulate the full visual impression, in other words, if you don't address every claim element to go to the analog of utility, that is problematic. And that's sort of an evidentiary proof reason why you should fail. So I think it's not a high hurdle. It simply is that in this case, they said there were only two differences and there were myriad other differences that they simply didn't address. But the way it should be done, and maybe the board was trying to say that's how much it's worth, is let's just get a claim construction right and then apply it and you win, whether or not it's proven or not. Is that right? I think that's generally the way it should work. But if you have a situation where a patent challenger simply doesn't address significant portions of the design, that's an additional evidentiary failure upon which to fail. I realize this may not be a problem that we can reconcile today, but I have a substantial concern that the 103 is assessed by the perspective of an ordinary designer, whereas infringement is assessed by the perspective of an ordinary observer. Because you could end up, you told me that, for example, in this art, it's a sophisticated art with a lot of prior art, but designers are very attuned to the nuances and the differences. So that means you can get a patent on something an ordinary observer would have absolutely said is the same thing. So you can get a patent over prior art because you're saying the ordinary designer are very attuned to these differences. They're going to focus in on the differences and that's going to impact their thinking on obviousness. Whereas the ordinary observer, say me, much less sophisticated, I'll tell you, I look at these things and know the difference. For sure, if I'm the ordinary observer, done. That means you get infringement damages against people when the very same thing or very similar things may have been in the prior art. And the ordinary designer, much more sophisticated, would have allowed you to get your patent. What do we do about that? Your Honor, I guess what I can say about that is I'm not aware of that ever having, a situation like that ever having come up, frankly. Well, I didn't know before this came that this is two standards for divorce. Did you also say earlier that the standard for anticipation is the ordinary observer? Yes, Your Honor, the test is an ordinary observer for anticipation. So if the ordinary observer is less particular than the ordinary designer, then theoretically you could end up in the situation that Chief Judge Moore just identified. Where to an ordinary observer, maybe a prior art reference would anticipate. Because an ordinary observer doesn't take that much care in examining every little nook and cranny of a particular design. But at the same time, because ordinary designers are so sensitive in a crowded art, they would take out the magnifying lens and look at every little mathematical difference between a claimed design and its primary reference. I mean, there's still the aspect of deception, I think, that broadens out the obviousness. That broadens out anticipation, you mean? Well, I think it makes sense. Yeah, potentially. Your Honor, so I'd like to talk a little bit about our differences between the government. I think that where we have the most firm agreement, I've already addressed, which is on that second step that the analysis continues as a matter of course. I think the way the government phrases the first aspect of the Rosenberlin test, instead of basically the same overall similar basic effect, my concern there is we agree with them that it's necessary to preserve this overall framework. And if it is a semantic difference, I don't think it's one the court should make, because we've got now 40 years of interpretation of what it means to be basically the same over the prior art. And I think going to a semantically different standard is not going to provide us with the clarity we need. And if it's loosening the standard, we also don't think that should be what the court does here. So basically the same test, as it's been articulated, simply requires an adequate starting point or similar design concepts. Other courts, the Campbell Court, have phrased it as not having substantial differences. And those cases allow consideration or reference to the skill designers' creativity, knowledge, and common sense. They allow the consideration of the full scope of the art. As I mentioned, that's what we urge here and what the board. One of the points made by LKQ is that statistics, whether it's 2% or 4%, are reasonably low. And therefore a change in real world consequences from the current legal approach would be a good thing, not a bad thing. How do I evaluate that argument? So I agree with the government's view on this. The comparison of the statistics between utility and design is not necessarily one that sheds a lot of light on things because they're so different. And one thing the government didn't mention that I'd like to is a point that Hyundai Amicus brief makes, which is that often these design patents, because it's a singular claim, you will see, for example, a shoe will be patented once, and then you'll see 20 more patents off that similar initial concept. So there'll be a lot of patents that come out of the same invention because you can't have 25 claims. And so I think that helps to explain, or it's a difference that helps to explain, why we see a different allowance rate. I think the narrowness of design patents is another reason why we see a difference in the allowance rate as compared to utility. So to answer your question, I don't... Might it also be the case that the world of designs, whether configurations or ornaments applied to articles, is so close to infinite that it doesn't matter as much in the real world if somebody has a particular design and therefore there's an implicit real-world policy assessment about whether something is being foreclosed to which alternatives are not so available? I think that, if I'm understanding your question... I'm just spinning it around, but I'm curious, I'm trying to understand what to make of this statistical point. I think the problems are, of having more patents granted at a higher rate, I think I would generally agree with you on it, but the purpose of these design patents is generally to patent something very narrowly to stop people from knocking it off. And so it's not the same, and they're also limited to that particular article. And so it's a much narrower grant than a utility patent might be. From your perspective, is it important or not important for us to decide if KSR overrules or abrogates Rosenberg? Well, I would think if we thought it over, we'd think that was important. That's what I was going to say, Your Honor. How about abrogating? Is it important for us to address that question? I think I would agree generally with the way Mr. Lindley phrased it. Of course, we do not think KSR overruled it implicitly or otherwise, but I would share Mr. Lindley's belief that the court is analyzing here whether the language about undue rigidity is inconsistent. And so I don't know that the court would agree with Judge Moore. Of course, we do not think it should be overruled, and that would be a problem for us, but I don't think the court necessarily needs to get there. What is the source of the legal authority the Rosen court had to articulate basically the same command for a primary reference? As far as I know, there was no case before Rosen that mandated that requirement or articulated any version of that, certainly not the Supreme Court, and we know it's not in the statute. So what's the source material for that? I think the source material for it is Jennings, which is a case proceeding, and I think that will answer Your Honor's question in part. It did not articulate... It just said starting point. It said, yeah, it says you need a starting point, and then Rosen goes from there and articulates what that starting point must be, building on that prior law. It's a heavy gloss at a minimum. I think it's a gloss that has been further refined over the last 40 years in a way that illustrates it does not have the heaviness that maybe it initially seemed it might. But isn't it true that neither Rosen nor Gerland discussed it themselves? That's right, Your Honor. I do not think it's a problem, Your Honor. I think it's a suggestion that the court there did not believe that Whitman's daughter precluded it from following the path that it did, and it's a suggestion I think not to necessarily over-read Whitman to preclude the further development of those tests. Did you just suggest that basically the same means something different today as applied by courts in the PTO today compared to what the Rosen court thought basically the same meant when it articulated that standard? I think what I'm trying to suggest, Your Honor, is that like any test, it's in a vacuum basically the same. It's perhaps difficult to understand, but that has been refined over the course of the last 40 years to provide further guidance about what it means in a way that... In fact, just to be clear, you're happy with the current conception of that standard and how it's applied. You're not suggesting that it should be in any way budged or modified in application? In application, no. We think the way that the court has developed this and articulated the meaning of what it means to be basically the same is the correct application. After a patent examiner finds a Rosen primary reference and a Gerland secondary reference, does the design patent examiner need to do anything more? My understanding is that's the end of the analysis. Yeah, I think if we read Gerland or Glavis as I do to require a reason to make a combination, yes. I think that's the finding. Right, the rationale for the combination is the fact finding that the secondary reference is so related in visual content to the primary reference. I would agree with that. There may be other factors that are considered along with that. And so, therefore, under the current regime, you don't at all think about or need to think about all those menu of rationales that the Supreme Court discussed in KSR. I think some of them are inapplicable. Obvious to try I think would not be applicable. But I don't think that Gerland precludes the consideration of additional things that might strengthen it. Why would obvious to try not be applicable to the design patent context if we're talking about, say, only a finite number of ways to, I don't know, have a certain product design feature look? Or why wouldn't it be easy to use or implement any single one of those known ways? I think the rub is in Your Honor's hypothetical. It's not finite. Design is, and there's been cases right about this in the lead compound test for similar reasons. It's not finite such that you could have a predictable solution within a finite set of options. Design is a situation where, while conceptually similar, lines, curves, shading, things of that nature, they have near infinite possibilities in their application, which is why obvious to try is ill-fitting in that context. Do you agree that Whitman Saddle did not use the reason for combining that the second reference was so related to the first, I think it was Granger, that it suggests itself to be used with the first? That's not the reason. The Supreme Court gave a different reason, didn't it, that in practice Saddlers, who I guess are persons of ordinary skill, ordinary designers, those folks typically routinely take the front end and back end of two different saddles, right? So isn't Whitman inconsistent? I mean, isn't Saddler inconsistent then with the Rosen-Durling so related test? I don't think it's inconsistent. I agree with Your Honor that they did, but I also think that it would fit as a secondary reference under the so related test as well. But they went beyond the so related test and gave a different kind of reason. They did in that case, and I don't think that precludes the further development of a test that refines that. And I think the so related test, I want to be very clear, I think requires merely that the designer of ordinary skill, that it be a reference that the designer of ordinary skill would look to. So I think Whitman didn't necessarily articulate it in those exact words, but in a sense that's what they did. They said Saddlers would combine these saddles. They would look to other saddles to get design motivation. And so I think that's not inconsistent with what ultimately became the test coming out of Glavos Incorporated and the Durling. Is the problem with the so related test that it says only in the descriptive term? I don't think that's a problem in its application, Your Honor, because what the so related test requires is merely a similarity, a visual similarity, between the references such that a designer of ordinary skill would look to that secondary reference. So I don't think that restriction is one that comes with the original application. Okay, thank you, counsel. Mr. Lemley, you have some rebuttal time. Thank you, Your Honor. So let me begin by suggesting that I think I've heard at various points everyone in the room agree that we need to change. I think the biological attorney did not say that. Everyone on this side of the table, Your Honor. The government certainly thinks we need a change of some sort. We need to remand.  So what I would say, Your Honor, I want to maybe modify my prior statement. I would have thought coming into this argument that we and the government were in complete agreement, almost complete agreement. What I would say is we were in pretty strong agreement with the government's brief. I'm not sure that that is fully represented in what was suggested in oral argument. I don't think it's right that it's going to be rare to ever go beyond a single reference at all. I don't think that's consistent with KSR. And I don't think that calling it a version of the Rosen test and saying it's basically the same but we'll just apply it more flexibly is actually going to communicate to the PTO, to the examiners, to the district courts what needs to be communicated. What about those concepts that we were discussing that were causing me pause, which is that the government suggested it doesn't have experts and it doesn't have the ability to really determine what an ordinary designer would or would not look to. What do we do about that? Well, I think it's not right to say that the government doesn't have experts. The PTO does hire designers. You can look in our reply brief at page 22. There's a reference to the PTO's own citation for what their qualifications are for a design patent examiner. You suggested to us that different designers in different fields may very well have a different approach  of the article of manufacture to look at other designs. Absolutely, Your Honor. I think just as we have utility patent examiners in different fields who have different specialties, I think that's true of the design patent world as well and that design examiners focus on particular subsets of the design field. They don't just do design as a whole. Now, I think that can be supplemented in appropriate cases by an applicant submitting a declaration as need be. We face the same problem for the PTO in the utility patent context, but it is a problem that we've been able to resolve either by looking to references that talk about the interests and motivations of designers, by looking to their own knowledge and skill, or by looking to expert declarations. But the difference in the analogous part with regard to utility patents is same field of endeavor. We can all wrap our head around that concept. It might shift, be broader or narrower in some circumstances. The other one is reasonably pertinent to the problem the inventor was trying to solve, not reasonably pertinent to whatever an ordinarily skilled article would say. So you've kind of recommended a test that isn't very much in all courts with utility patents for analogous art. Well, I think this court could articulate a test that was reasonably pertinent to the problem the designer, the patent applicant, was trying to solve. I'm okay with that modification. I would like briefly to address Judge Stark's questions about claim construction because I think, if anything, it is an independent reason to reverse in this case. The board incorrectly believed Rosen and Durling required a detailed claim construction. If Rosen's not good law, I don't think that's true. But this court has repeatedly, an Egyptian goddess said, we don't require a detailed verbal claim construction. It's even discouraged it in cases like Crocs from having one at all. And the board in this case, at the institution stage, said no verbal description was necessary. So we didn't give a verbal, a detailed claim construction. And then it held in the final decision that a reason for rejecting our view was that we didn't give a sufficiently detailed claim construction. We don't think a claim construction should be required at all, but it certainly shouldn't be required here as a gotcha after the board had decided the opposite. Finally, I would like to address Your Honor's concern, which I share, about the sort of challenging overlap between ordinary observer and designer. Design patents are, design patent infringement is different than utility patent because it requires an ordinary observer. And I think there is a potential problem in which we could find something under current law to be obvious, non-obvious under one standard, even though it's something that would cover the prior art. To me, that's a reason we can't just fall back on some formulation of basically the same. We can't leave us in a circumstance where an invention that is in fact obvious not only gets a patent, but a patent that turns out to be infringed by something that should have fit within the prior law. If we only made one change, what should that change be? Overrule Rosen and Durling, Your Honor. That's not going to happen. Thank you, Your Honor. I thank all counsel. We appreciate your guidance today.